May it please the Court, Counsel, Your Honors, it's nice to be here live in St. Paul. We're here today to reverse the District Court for its finding that the Trustees had exclusive standing and that our claims were property of the bankruptcy estates. We also seek to reverse the District Court that we failed to state a claim upon which relief can be granted on plausibility. I'm going to jump right into standing. One of the themes today is this is premature. We're here again, a couple familiar faces from the last time in 2019. We still have had no discovery and we're here on Rule 12. But the first issue is really one of standing. And I think you have to start the analysis with the Eighth Circuit. You've got to start with the Ozark case and you've got to start with the code. And if you start with 541 of the code and the Ozark case, that tells you your first inquiry is whether or not there was an injury to the debtor corporation the day before they filed. And here, there was no injury by any of the 12 debtor corporations. They were not damaged by the aiding and abetting fraud claim in 2008. And that's borne out that they had no specific injury. Why didn't they have a specific injury? Well, one of the reasons that PCI and PGW didn't have a specific injury is because they participated in the very fraud and they participated in the $146 million that Mr. Ritchie lost. Is that the way we looked at it or is it the fact that Petters and, by extension, the folks who aided and abetted his fraud harmed the companies that he ran? In other words, he took money, Petters took money out of those companies and misappropriated them. Isn't that an injury if we assume that the corporation is separate from the individual running it? I respectfully disagree, Your Honor. Okay. How's that? That is not the loss. You're talking about money leaving the company. Our claims are we relied on misrepresentations which caused us to put our money in. And our money went in to PCI. So how can they be damaged by not paying their creditors? We submit it's not even recognized in the code. And if you look closely at Ozark and you look closely at 544 and even Kaplan, the code does not provide for what you just suggested, that you can pull back in a claim or that they're somehow damaged. They didn't discover... Well, I'm trying to get precision here because I think what you're not arguing, I think you're not arguing that they weren't damaged. I think the companies clearly were damaged. I think your argument, I'm trying to focus you, is more that the damage occurred to these plaintiffs in a different way than the debtor corporations were damaged. I don't know how the companies could be damaged by the fraud on Mr. Ritchie when our money went in to the company to pay the creditors. And that's where, you know, Judge Frank respectfully fell into this that our loss is the inability to pay creditors. And we submit there's no basis for that. And our loss isn't that the Ponzi scheme collapsed. Our loss is, again, our money going in. We were induced to have it go in. And I would submit that there's nothing in the law that says that's a specific injury. And we do take umbrage with the guilty plea. It's not just a guilty plea by the debtor corporation. It's a guilty plea that they actually participated in this fraud, and specifically the 146 million that caused us to put it in. What about the bar orders? I mean, I read all the exclusive standing cases. None of them seem to talk about the bar orders. But there's clearly jurisdiction for the bankruptcy court to issue the bar orders. And the bar orders would seem to cover this particular situation. So I just want to get your take on it. I'm not sure what to do with them. Once again, we disagree, Your Honor. The bar orders say that if it's derivative, it belongs to the trustees. But if it's direct, it belongs to us. So how can we have a derivative claim that doesn't flow from an injury to the corporation? The corporation was not damaged the day before they filed. They were not damaged by this 2008 fraud. And if they're not damaged, we can't be derivative. And this whole, we think, I think the analysis can stop right there. You don't even need to get into direct versus derivative. But if you want to go there, the Medtronic case tells you how to analyze it in our state. So Ozark says 541, direct versus derivative, go to state law. Medtronic says if it's a corporate injury, the corporation owns it. If it's a shareholder injury, the shareholder owns it. You can have dual standing, Your Honor. It's not exclusive. And that's what we're here about. The bar order, they can have a claim. They can have a fraudulent transfer claim. Mr. Kelly, who signed the guilty plea for PCI and PGW, can have a claim against J.P. Morgan for fraudulent transfers. But we can also have a claim. And that's recognized in Medtronic and also recognized in Buccaneer, if you want to go to different circuits. The Buccaneer case says you can have concurrent or dual standing. And so the bar orders, if, as long as we're direct, I think the bar order can, you know, be in place. I'm not saying bar any bar order ever. What I'm saying is it's not derivative. And so it doesn't apply to us. And so I do agree. Let me, I just want to, I want to understand the relationship here. Do you agree that there could be a situation in which you have, like there is, there is exclusive standing or there isn't exclusive standing and the bar orders can say something different? Or do the bar orders always go along with sort of the standing inquiry? I'm relying a little bit. I'm trying to understand the relationship between the two. I just, the word exclusive standing, I mean, we have a state law tort claim. And a trustee who pleads guilty to it owns it and has exclusive standing. I don't think that's what the bar orders say. The bar orders say, if you're a derivative, it belongs to the corporation and you're barred. If it's direct, then it, you can have a state law tort claim and have it direct. You can't have both. And I don't know if I'm answering your question, but you can have both. The bar doesn't use the word exclusive. Right. Okay. And I, I want to jump, if there's no more questions on standing, I'm going to get to aiding and abetting fraud quickly. So the trial court did not even cite Ozark and did not even cite 541. And so I think if you stick to the Eighth Circuit law, we clearly have standing. It's not exclusive and it doesn't belong to them. Now on aiding and abetting, first of all, the primary violation is conceded. There's three elements. Actual knowledge or conscious avoidance. The trial court didn't reach conscious avoidance at all. We submit, again, premature Rule 12. We've stated plausibly that they had actual knowledge. And J.P. Morgan and Richter both knew there was a fraud in September of 2007. It's got to be deemed true. It's Section, Paragraph 167. They knew and they told Mr. Petter's lawyer, we know of the fraud and we want to get paid. We want to get paid immediately. But this is a big pivot in the case because they decided to stay in the fraud. Think of that. They decided that they knew of a fraud and to stay in it. And then they directed how to get four incremental payments. They directed where those payments should come from. They actually said, we want them from Petter's Capital, not from PCI. So we have the ‑‑ Counsel, help me here. You said they knew about the fraud. I agree. There's allegations in there about J.P. Morgan. Point me to the part of the complaint that specifically says Richter knew about the fraud. That's in 156. Richter, I believe Richter was ‑‑ we alleged Richter's at the meeting when they talked to Traub and then Traub gets on the plane and tells Petter's they know. So Richter is at the same meeting. And again, they're structuring these payments basically saying don't come over here from PCI account and don't come in 20 million. We want them in small increments. Okay? So we believe they knew in 2007. And then they further engaged in other conduct and they insisted, they put us back against the wall. And what do you put someone like Mr. Petter's back against the wall when you know he's engaging in fraud? He commits further fraud. It's foreseeable that he would commit further fraud and that's what he did. Committed further fraud on us on February 1st, 4th, 7th. Now, what did J.P. Morgan know? It's a strong inference of actual knowledge or it's conscious avoidance. But on February 7th, they extended credit to a known fraudster. On February 7th, 12 million went to Mr. Petter's entities the same day our 12 million came in. The most sophisticated bank in the world didn't know that who they were loaning money to right before the closing was getting new money. That's an inference that they knew. They knew our identity. Richter knew our identity. They're the agent. They're put in there. They're put in there with a retainer to put due diligence materials. We submit that we have alleged enough for actual knowledge of the fraud. And then we go to March. After they get paid off in February, they stay in the fraud. They stay in the fraud after they pay the syndicated lenders on February 15th. They restructure. They do a new UCC1. They do a new security agreement in March because now they want to get paid on their other note. And here they are turning a blind eye. And again, we get victimized. The same day as the UCC1 on March 19th, we get an email from Mr. Petter's defrauding us again of 31 million. So we submit we've met enough and conscious avoidance is recognized. And Judge Frank did not even analyze. He recognized conscious avoidance, but he didn't say we didn't need it. I want to go to substantial assistance quickly. Substantial assistance and proximate cause have been used together. And I would submit that you start the chain of causation again in September of 2007. That's when they know of the fraud. The chain of causation starts there. They're owed 50 million. They get paid the 20 million. They know they can't have a new lender. They've got to go to the aftermarket lenders because a conventional bank won't touch them. They know there's no audited financial statements. They know Polaroid is losing 10 million dollars a month. They know they're insolvent. And what are they doing? They're substantially assisting and help concealing. And that's Silver Creek and Winnick and Fraternity Fund are some cases that talk about those that, you know, did they have an affirmative act? They did have affirmative acts. Did they help conceal? They did help conceal. And what exactly for J.P. Morgan, what exactly was the substantial assistance? I know J.P. Morgan had loaned money over time, but what was the substantial assistance in the fraud itself? The substantial assistance in the fraud itself starts in September of 2007 when they basically said don't pay us with PCI money. They assisted by not shutting it down. They assisted by not foreclosing on the assets. They have a duty not to conceal and not to substantially assist. The other willful blindness, if you will, in substantial assistance was round tripping the money. They turned off their alerts. They put in Richter arguably to have deniability. That's why they had an agent there. The substantial assistance again was the February 7th is a big substantial assistance. They lent new money to get the closing to happen. And, you know, Your Honor, I got 22 seconds here, but the approximate cause, you know, again is did the sequence of events and was it foreseeable? And again, we're at Rule 12. I mean, look at how much we figured out without any discovery. And I'm going to reserve two minutes. I want to get into the fraudulent transfer claims, but I'm going to reserve those for rebuttal. Thank you. All right. Thank you, Mr. O'Neill. All right. Mr. Pegg, you have 11 minutes. Out of order. Is it Mr. Turner? It's Mr. Turner. All right. May it please the Court. Alan Turner from Simpson Thatcher & Bartlett representing the J.P. Morgan Chase defendants. I want to start by addressing the question of standing. Your Honor, here Ritchie is asserting claims that any other creditor that suffered in the Petters Ponzi scheme could have asserted. They are alleging that J.P. Morgan Chase and Richter aided and abetted Petters in his Ponzi scheme. And specifically, they say, with respect to J.P. Morgan Chase, that it, quote, cropped up Petters long enough for Petters to ensnare one more victim. That's a classic situation where Ponzi scheme victims all have the same interest. And that interest is one that can only be asserted by the bankruptcy trustee. This is an issue that Ritchie and other Ponzi scheme investors have lost on the exact same issue in multiple other courts. So the Ritchie v. General Electric Capital Court case in the Southern District of New York, affirmed by the Second Circuit. The Ritchie v. Opportunity in the Northern District of Illinois. And Greenpond v. GECC in the Minnesota Court of Appeals. Are those cases factually distinguishable? Mr. O'Neill says that under the facts here, this is not a derivative claim. They are not at all distinguishable, Judge Grass. They are exactly the same circumstance. And in fact, in two of those cases, it was Ritchie making exactly the same allegations. Importantly, here, there are no allegations in this complaint that J.P. Morgan Chase had any dealings with Ritchie at all, made any representations to Ritchie at all that could possibly make this a direct claim against J.P. Morgan Chase. Mr. Ritchie refers to the Ozark case. In that decision, this Court held that whether a claim can be asserted by the bankruptcy trustee or is one to be asserted individually by creditors or shareholders is a question of State law. And in that case, it was an alter ego claim, a veil-piercing claim. And this Court said that under Arkansas law, that is something that could not be asserted by the corporation. So that is distinguishable from that perspective, because this Court also held in the same kind of claim that's being asserted here is one that the corporation itself could have brought the day before it filed for bankruptcy, and therefore, the bankruptcy trustee has exclusive standing to assert that claim. In Reese Senior Cottages, the Court also addressed another argument that Ritchie raises here, which is that the participation of the corporation in that wrongdoing somehow would deprive the corporation of standing to assert that claim. Here in Senior Cottages, the Court said that it agreed with the First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties, though it may well give rise to a defense that will be fatal to the action. That addresses the argument that Ritchie makes with respect to the in pari delicto defense. That is a defense to a claim, something that could be determined on the merits, but it does not deprive the bankruptcy trustee of standing to assert that claim. Where does this idea of exclusive standing exactly come from? It seems it's, you know, I've tried to trace it throughout all the circuit cases and some of the Bankruptcy Trustees, but it's a, you know, a concept that at some point made it into the case law. Do you know exactly where it comes from? I've followed the same trail as Your Honor has. I think it really is a product of Section 541 of the Code, which vests in the bankruptcy trustee all claims that could have been pursued at the time of the filing for bankruptcy. And the import of that is that those claims are centered in the bankruptcy trustee's realm. Because any other result would lead to multiple individual lawsuits by creditors of the corporation. Those are the kinds of claims that have been brought around the country and have been dismissed, both by Ritchie, by Gecker, by Greenpond. So that is why you have the result that here the bankruptcy trustee has exclusive standing. What's the relationship to the bar orders? I asked opposing counsel the same thing, and they seem to cover, in almost every case I could find, similar things, that the bar orders sort of protect the exclusive standing of the debtor to potentially sue or the trustee to sue. Is that your take on it as well? The bar orders here would have preserved to Ritchie any direct claims it could have asserted. Now, remember, when those bar orders were entered, Ritchie had 22-odd clauses of action. Those included some direct claims against J.P. Morgan and other defendants, a negligence claim and a breach of fiduciary duty claim. In the district court, we did not argue that those claims were the property of the bankruptcy trustee. Those were Ritchie's claims to bring, but they failed for other reasons. They failed because they were untimely, and they failed because Ritchie was unable to assert that there was a duty owed by J.P. Morgan Chase to Ritchie, because there was simply no connection between them prior to the loans that Ritchie made to Petters. So we're not saying that Ritchie could not have brought a claim had it been able to plead one. It's not out of court entirely, but these claims, the claims that are left here, aiding and abetting, aiding and abetting what? Aiding and abetting Petters' fraud. Petters' Ponzi scheme was, as Your Honor said, a misuse of the corporations over which he had dominion. And those claims are claims of the corporation against anybody who is alleged to have aided and abetted the corporation and Mr. Petters in that regard. Just briefly, Your Honors, with respect to the failure to state a claim issues. I'm sorry. I'm going to go ahead and back up to the standing issue again. Ritchie relies pretty heavily on a bankruptcy case from the Southern District of Florida, Enright Palm Beach Financial Partners. Other than just telling me that it's inconsistent with other cases, why is it wrong? Your Honor, it's wrong because it ignores one of the issues that I addressed in response to Judge Strass' questions. It ignores that the bankruptcy trustee is the funnel through which all claims that are general to the creditors of the corporation are brought. And it really does not address the issues that were laid out in the four cases that I described earlier. It simply says that where a corporation is a, quote, sham corporation, it cannot have been injured. But that argument is directly contrary to this Court's holding in Enright Senior Cottages. The corporation can be injured, and here it was injured, because the actions of Mr. Petters drew it deeper into insolvency. So the corporation was injured, and that is why the corporation had the claim. Just briefly, with respect to the aiding and abetting counts, they require actual knowledge, actual knowledge by J.P. Morgan Chase of the fraud against Ritchie. Everything I heard from Mr. O'Neill and everything in their briefs relates to alleged general knowledge by J.P. Morgan Chase in Petters' fraudulent use of his companies for a Ponzi scheme. Nowhere is there an allegation of actual knowledge by J.P. Morgan Chase in the specific fraud by Petters against Ritchie. There's no allegation that J.P. Morgan Chase knew that Ritchie was making loans to Petters. There's no allegation that of J.P. Morgan Chase having knowledge of the specific representations or misrepresentations that Mr. Petters made to Ritchie. And without any allegations of such actual knowledge, that claim necessarily fails. It's not enough to allege generally that J.P. Morgan was aware of suspicious transactions or that there were red flags with respect to Petters' entity's financial condition. The cases that we've cited in our brief, Brosner against Bank of China and Heinert and Bank of America, make clear that there is no knowledge based on, quote, red flags or suspicious transactions. So conclusory allegations that J.P. Morgan Chase knew about the fraud do not prove, do not establish knowledge of the specific fraud as to Ritchie. Finally, with respect to substantial assistance on the aiding and abetting counts, here this requires a showing that the defendant affirmatively assisted, helped conceal, or by virtue of failing to act when required to do so, enabled the plaintiff to suffer. The Second Circuit in SPV Osses v. UBS held that proximate cause is required, contrary to the statements in Ritchie's brief, which cites earlier district court cases to the contrary. So here there are no allegations of anything specifically that J.P. Morgan Chase did to assist Petters in his fraud against Ritchie. I see that my time is nearing completion, and I want to defer to Mr. Pegg. Unless the Court has any other questions, I'm content to rest on my briefs for the other issues. All right. Thank you, Mr. Turner. Thank you. Mr. Pegg, you may proceed when you're ready. Good morning, Your Honors. May it please the Court. Alan Pegg of Hogan Lovels on behalf of Appellee Richter Consulting. Our time together this morning, Your Honors, is necessarily short, so I want to dive right into a couple of the facts and then turn to the law. Mr. O'Neill started his presentation by focusing on the fact that we are at the Rule 12 stage and that discovery has not yet undertaken, despite the fact that the case was filed back in 2014. So let's take him up on that and let's look at what the Third Amended Complaint factually and plausibly or implausibly alleges as it relates to Richter. First, in paragraph 143, the allegation is that Richter was hired in 2007 by Polaroid to assess Polaroid's borrowing capacity, nothing to do with Ritchie. Paragraph 143 also alleges that Richter's job was to report to Polaroid and J.P. Morgan, not Ritchie. Paragraph 49 tells us about the tree, the ownership tree of Polaroid. It was a legitimate company, in turn owned by Polaroid Holding Company, also a, quote, legitimate business, which was, in turn, owned by Petters Group Worldwide, which paragraph 49 specifically alleges to have been not operated as a Ponzi scheme. Now, what's absent from the Third Amended Complaint is any allegation whatsoever that Richter and Ritchie knew or knew about each other. My friend, Mr. O'Neill, says that the allegation is that, quote, Richter knew our identity. Your Honors can scour the Third Amended Complaint, and that allegation does not exist because it was not true. And finally, what the Third Amended Complaint does allege in paragraph 200 is that Richter, in fact, did not know. The affirmative allegation in paragraph 200, again, is Richter did not know about the fraud being committed through Petters. What about the due diligence documents? Do they bear on knowledge at all or substantial assistance for that matter? Sure. Let's talk about those. And they've been loosely identified in the Third Amended Complaint, Your Honor, Judge Strauss, as the due diligence materials. First, if you look at them, and Ritchie specifically alleges that Richter's name doesn't appear on them, and, in fact, other courts have found that they were prepared by Duff and Phelps in 2007, not by Richter. The best that Ritchie gets to in terms of Richter's role is that they use — Ritchie uses a couple of terms. One, ratify the due diligence materials. And, Your Honor, I think that that's perhaps among the most quintessential conclusory allegation that we could think of. And it certainly fails Iqbal Twombly. It certainly fails the Rule 9b requirement. But then in paragraph 296, Judge Strauss, the allegation is that Richter somehow assembled and developed these due diligence materials. But the further allegation is that Richter was not the sender of the due diligence materials to Ritchie. That was, in fact, somebody from PGW. Richter was not even copied on those due diligence materials. And other courts, the Polaroid II Court, Judge Nelson found, after trial, that Ritchie did not even look at those documents before deciding in February 2008 to make his initial tranche of loans. So I would submit that the due diligence materials, Judge Strauss, are literally much ado about nothing. And they certainly do not show — they don't speak to actual knowledge, and they don't speak to the sort of affirmative conduct that Winnick and the other cases require in terms of substantial assistance. Let's talk for a moment — I would agree wholeheartedly and on all fours with my good colleague, Mr. Turner, about the standing issue, the claim — there's only one claim against Richter. That's for aiding and abetting fraud. It fails for lack of standing, as it does to J.P. Morgan. Unless Your Honors have any questions, I'll leave that at that. Mr. O'Neill — and I see my time is running short — said that conscious avoidance may be sufficient. That's not true. In Rea-Gabe, Southern District of New York, from 2010, confirmed that actual knowledge of the underlying fraud is required. That's not sufficiently pled. Substantial assistance isn't pled. And — I'll give you 30 more seconds, because I believe your co-counsel had 30 seconds left. I appreciate that, Your Honor. So if Your Honor has any specific questions, I'm happy to handle them. But in terms of what — let's talk about actual knowledge momentarily. The best that the Third Amendment complaint pleads is that Richter may have — and I'll put it charitably — Richter may have known about Polaroid's difficult financial situation. That has nothing to do and does not speak to or relate to Pedder's fraud and Ritchie's potential investment based on alleged misrepresentations in that fraud. So actual knowledge can't be pled — can't be alleged generally. It needs to be actual knowledge of the specific fraud that the plaintiff alleges harmed it. And that's absent from the Third Amendment complaint. For all these reasons, the district court judgment should be affirmed.  Thank you, Your Honors. Mr. O'Neill, just wait. Mr. O'Neill, just wait a second. All right. You may proceed. Briefly, just on standing again, I just don't — you know, if you start with 541, there is no injury the day before they filed from this fraud, February of 2008. And if you want to — you can't pull a claim back in. And if you follow the code and follow Ozark, they have to be injured the day before by this very act. And if you look — if you really want to compare their complaint, the trustee's complaint, they don't mention February of 2008. They don't mention aiding and abetting fraud. They do mention aiding and abetting tortious conduct of Pedder's taking money out. But again, our fraud is unique to us because we put money in. And they paid their creditors with our money. What about the fraudulent conveyance claims? You mentioned — Yeah, I do want to — I want to — And those seem to be quintessential. That's the bread and butter of sort of a bankruptcy proceeding. So I wonder if those are different than the aiding and abetting. Yeah. And, Your Honor, my suggestion is don't forget about March, okay, because again, they stayed in the fraud after they paid the syndicated lenders. And we have a $6.5 million claim that's unique to Mr. Pedder's personally, our argument, and also that he signed a new security agreement. And the receiver does not have standing to avoid a transfer that belonged to Tom Pedder's personally. That's not exclusive standing by the receiver. And we go into constructive fraudulent transfer, and I know that you're an expert from Finn v. Alliance Bank in this issue, but constructive fraudulent transfer, good faith is in dispute, and in particular on Count 8, on actual fraudulent transfer. Of course, it's presumed Mr. Pedder's had intent to hinder or delay his creditors. And Judge Frank seemed to suggest that J.P. Morgan's intent on Count 8 was relevant, and that's its error as well. So to conclude, it's premature today. We're at Rule 12. We've stated a claim upon which relief can be granted. And there's not exclusive standing. You can have both. They can have standing under their causes of action, and they can have our own claims, and we should be allowed our day in court. Thank you very much. Thank you.